# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Catherine WILLIS, <br><br> Plaintiff, <br><br> v. <br><br> UPMC CHILDREN'S HOSPITAL OF PITTSBURGH, <br><br> Defendant. | Civil Action No. 13-131 |

## MEMORADUM OPINION

CONTI, Chief Judge

## I.   Introduction

Defendant UPMC Children's Hospital of Pittsburgh ("Children's") moved for summary judgment on the two claims asserted by plaintiff Catherine Willis ("Willis") in her amended complaint (ECF No. 18). Those claims assert age discrimination and hostile work environment[1] under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (count 1), and the Pennsylvania Human Rights Act ("PHRA"), 43 PA. STAT. §§ 951–963 (count 2). (Am. Compl. ¶¶ 17, 33, ECF No. 18.) For the reasons that follow, Children's motion for summary judgment will be granted.[2]

---

1   In the amended complaint, both count 1 and count 2 have the subheading "Age Discrimination and Hostile Work Environment." The amended complaint contains no factual allegations addressing a hostile work environment claim, and Willis's brief in opposition to Children's motion for summary judgment (ECF No. 33) makes no mention of the hostile work environment claim and solely addresses the age discrimination claim. The inclusion of "hostile work environment" in the amended complaint appears to be a drafting error. To the extent the hostile work environment claim was intentionally included, the claim was abandoned and the court need not consider it further.

2   Children's argued that the plaintiff's failure to mitigate damages precluded her from any otherwise available remedies; however, since the age discrimination claim failed to survive summary judgment, the court did not address this issue.

## II. Factual Background

### A. *Willis's Employment as Lead Neonatal Nurse Practitioner*

Willis, a neonatal nurse practitioner, began working for Children's on August 16, 1993, and remained in the neonatal group until her termination on January 13, 2012. (Joint Concise Statement of Material Facts ("JCS") ¶¶ 1, 3, ECF No. 40.) From 2001 to 2011, Willis's title was lead neonatal nurse practitioner. (Willis Dep. 13:4–10, Mar. 21, 2014, ECF No. 30.) During the period at issue in this suit, Willis's direct supervisor was Margaret Lamouree ("Lamouree"), a nurse manager for the newborn intensive care unit ("NICU"). (*Id.* at 14:9–15:13.) Lamouree's supervisor was Cynthia Valenta ("Valenta"), and Diane Hupp ("Hupp") was the chief nursing officer at Children's. (*Id.*)

### B. *Disciplinary Incidents*

#### 1. *September 5, 2011 – Final Written Warning*

On August 19, 2011, a patient that had undergone surgery required an endotracheal tube, and Willis received a phone call indicating she was needed in the patient's room. As Willis walked to the patient's room she passed nurse Amber Wanca ("Wanca") who said to Willis, "the tube must be out." (*Id.* at 35:5–6.) Willis had complained about Wanca's incompetence in the past and admitted to saying, in the hallway, "that fucking tube better not be out, Ill [sic] fuckin [sic] kill someone." (Def.'s Ex. 4, ECF No. 30.) The statement was made at approximately 3:00 a.m., and the patient's father was in the room with his child. Willis did not know whether any staff member had heard what she said. (Willis Dep. 39:23–25.)

On September 5, 2011, a final written warning was issued to Willis stating that "[o]n 8/19/2011, several staff members witnessed, and upon questioning, you admit to using inappropriate language including the use of the word 'fuck' while in close proximity to patients and families." (Def.'s Ex. 3, ECF No. 30.) The final written warning additionally stated that "you will be removed from the lead role and expected to treat both internal and external customers with dignity and respect at all times." (*Id.*)

Sometime during September 2011, after the issuance of the final written warning, Willis attended a meeting with Lamouree, Valenta, and Hupp. During this meeting, Lamouree and Valenta discussed potential changes to the lead neonatal nurse practitioner position. The changes included more administrative and budgetary duties and fewer nurse-related tasks. (*Id.* at 16:25–17:4.) Willis believed she was qualified for the job with the proposed changes but stated that she sensed that Lamouree and Valenta "no longer wanted [her] in that role." (*Id.* at 13:17–19, 17:10–13.) Feeling "coerced," Willis ostensibly volunteered to step down as lead neonatal nurse practitioner at the meeting in September 2011. (*Id.* at 17:10–21). Lamouree stated that part of the reason Hupp, Valenta, and she asked Willis to step down was "her treatment of staff" and handling of the schedule for subordinate nurses. (Lamouree Decl. ¶ 9, June 16, 2014, ECF No. 30.) Willis stated that when she stepped down, Children's did not immediately make the changes discussed in the meeting referenced above, and did not immediately put someone in the lead neonatal nurse practitioner role. (Willis Dep. 18:1–13.) Willis signed the final written warning on September 15, 2011. (*Id.* at 39:23–25.)

### 2. *January 3, 2012 – Confrontation with NICU Leadership Staff*

A disagreement between Willis and another member of the nursing staff led to Willis becoming frustrated with that unexperienced nurse's alleged lack of urgency. (*Id.* at 42:22–25.) The incident began when the less experienced nurse intended to find another nurse to start an *IV* on a patient. Willis did not believe there was time to wait, and she put the *IV* in herself. (*Id.* at 41:5–22.) Afterwards, Willis went to speak with the clinical leaders, Bonnie Landgraf and Sherry Rosato, to express her concerns about the incident with the *IV* and the nursing staff's overall lack of experience. (*Id.* at 43:3-4.) The NICU supervisor, Missy Locke ("Locke"), was nearby, and Willis raised her voice so that Locke could hear and join the conversation. (*Id.* at 43:22–44:14.) Willis denies yelling during this conversation. (*Id.* at 42:20–22.)

Lamouree sent an email to Jenelle Taylor ("Taylor"), a human resources consultant, on January 11, 2012, summarizing a conversation she had with Willis about the incident on January 3, 2012. (Def.'s Ex. 5, ECF No. 30.) In the e-mail, Lamouree explained that Willis voiced concerns that the level of inexperience among the nurses was having an adverse effect on the patients. (*Id.*) Lamouree stated that Willis "[went] back to the clinical leaders office area because she wanted them to know that these newer nurses did not have sufficient knowledge to recognize the urgency of the situation and did not have the skills to start the IV." (*Id.*) Lamouree told Willis that the clinical leaders were offended by how Willis treated them. Willis replied that she felt "she needed to make a point about how inexperienced some of our staff were." (*Id.*) When Lamouree asked Willis if she could have handled the situation without yelling, Willis replied, "Nevermind, I'm always wrong," and left the room. (*Id.*) Except for Lamouree's characterization of Willis's speech involving yelling, Willis acknowledged that Lamouree's summary of the incident was accurate. (Willis Dep. 51:18–54:10.)

### 3. January 11, 2012 – Leaving Shift Without Completing History and Physical on Patient

Willis received a patient on January 11, 2012, and spoke with the patient's parents; however, she "did not perform a history and physical nor did she complete admission orders other than neosure and a pulse ox order, which are not inclusive of routine admission orders on a NICU baby per neonatologist and NICU director." (Ex. 6, ECF No. 30.) The nurses were separated into blue and green teams; the patient was admitted to the blue team. Willis was assigned to the green team, and Holly Bernardi ("Bernardi") was assigned to the blue team. (JCS ¶ 40.) When asked why neither the orders were placed nor the history and physical completed, Willis responded during a phone call with Hupp, detailed in an internal memo, that she thought she had placed the orders. (*Id.*) Willis testified, however, that the patient involved was not hers and that Bernardi knew Willis was only putting in admission orders and would not be

4

conducting the history and physical. (Willis Dep. 57:10–11.) Willis stated that it was commonplace for admission orders to be completed by one nurse and the history and physical requirement to be completed by a nurse arriving for the next shift. (*Id.* at 57:22–25.) According to Hupp's summary, when Hupp asked Willis whether she had informed the incoming shift that a history and physical still needed to be done, Willis said it was "very busy" and she was unable to say to whom she reported off. (Ex. 6, ECF No. 30.) On January 12, 2012, Willis provided a description and response to this incident in an email to Hupp; Hupp forwarded the email to Taylor in human resources. *Id.*

### C. Termination

On January 13, 2012, Willis attended a staff meeting conducted by Hupp during which she announced that the neonatal nurse practitioners would receive a ten percent increase in compensation and that Stephanie DiSilvio ("DiSilvio") would serve as interim lead neonatal nurse practitioner. (Willis Dep. 84:6–85:9, 87:1–9.) Following this staff meeting, Willis was called into another meeting with Hupp, Valenta, and Lamouree. Willis received a termination letter citing the final written warning from September 2011 and the incidents on January 3, 2012, and January 11, 2012, as reasons for termination. (Def.'s Ex. 1, ECF No. 30.) Willis and Hupp signed the termination letter on January 13, 2012. (*Id.*) At the time of her termination, Willis was sixty-one years old. (Willis Dep. 5:2–4.) Willis filed a Charge of Discrimination with the Equal Employment Opportunity Commission in April 2012. (JCS ¶ 19.)

Willis testified that she "[a]bsolutely" believed that her termination was a result of age discrimination that was rooted in economics. (*Id.* at 83:24–84:1.) However, the only conversation Willis could recall that involved age was one in which she indicated that she planned to work until age sixty-five. (*Id.* at 66:19–67:1.) When asked what Lamouree had said that suggested an age bias, Willis responded: "I cannot recall a specific comment [suggesting] a bias towards my age." (*Id.* at 67:6–7.) When asked if

5

Hupp or Valenta had said anything that suggested an age bias, Willis responded that they had not. (*Id.* at 67:19–68:1.) The lead neonatal nurse practitioner position was filled, in September 2012, by Becky Graves, who is twenty-eight years younger than Willis. (JCS ¶ 44.) DiSilvio, thirty-one years younger than Willis, was promoted to manager of neonatal nurse practitioners sometime between January and the spring of 2012. (*Id.* ¶ 45.)

## III. Legal Authority

### A. *Standard of Review for Summary Judgment*

Summary judgment is appropriate when the movant is entitled to judgment as a matter of law, and the record shows no genuine dispute concerning material facts. FED. R. CIV. 56(a). When considering a motion for summary judgment, the court's role is to determine whether the evidence could allow a reasonable jury to produce a verdict for the nonmoving party—not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists and may carry that burden by illustrating to the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when it stands to "affect the outcome of the suit under the governing law" and could result in a reasonable jury returning a verdict in favor of the nonmoving party. *Liberty Lobby*, 477 U.S. at 248. Once the moving party carries its burden, the nonmoving party must "make a sufficient showing on [the] essential element[s] of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. When a nonmoving party opposes a motion for summary judgment, the party must identify those facts of record that contradict the facts identified by the movant. *Childers v. Joseph*, 842 F.2d 689, 694–95 (3d Cir. 1988).

### B. Employment Discrimination Standards

The ADEA prohibits employers from "discharge[ing] any individual or otherwise discriminat[ing] against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In ADEA cases, the plaintiff "must prove by a preponderance of evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). When the plaintiff provides no direct evidence of age discrimination, the Court of Appeals for the Third Circuit has adopted the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005). The plaintiff's age discrimination claims under federal law and state law are addressed simultaneously under this framework. *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) ("[T]here is no need to differentiate between … ADEA and PHRA claims because … the same analysis is used for both.").

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of age discrimination. The plaintiff's general burden at the prima facie stage is to show "'circumstances that give rise to an inference of unlawful discrimination.'" *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (quoting *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995)). The first three elements of the prima facie case are: (1) the plaintiff is over forty years of age; (2) the plaintiff is qualified for the position in question; and (3) the plaintiff suffered an adverse employment decision. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). The fourth element of the prima facie case is flexible and "depends on the circumstances of the case." *Massarksy v. Gen. Motors Corp.*, 706 F.2d 111, 118 n.13 (3d Cir. 1983). Courts often frame the fourth element as requiring proof that the plaintiff "was replaced by a sufficiently younger person to create an inference of age discrimination." *Sempier*, 45 F.3d at 728; *accord Smith v. City of Allentown*, 589 F.3d

7

684, 689 (3d Cir. 2009). Replacement by a younger person is not always required. The Court of Appeals for the Third Circuit has found the prima facie case satisfied where, for example, a plaintiff was not directly replaced but younger employees took over the plaintiff's responsibilities when the plaintiff was discharged. *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994). If the plaintiff is able to establish a prima facie case, the plaintiff will have "raise[d] an inference of discrimination only because we presume these facts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). The prima facie "inquiry, however, was never intended to be rigid, mechanized, or ritualistic." *Id.*

Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant employer to "articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision." *Smith v. City of Allentown*, 589 F.3d at 691. To meet this burden, the employer need not prove that a nondiscriminatory reason motivated its decision; rather, the employer must provide a reason that allows the conclusion to be drawn that the decision was made for nondiscriminatory reasons. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Once the employer provides a nondiscriminatory reason for its decision, the burden of production shifts once more to the plaintiff to show, by a preponderance of evidence, that the employer's reason was pretextual. *Id.* The plaintiff must show that the reason proffered by the employer was not the true reason for the adverse employment decision by pointing to evidence that could allow a fact finder to either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Id.* at 764. To establish that the employer's proffered nondiscriminatory reasons are unbelievable, the plaintiff must point to evidence in that record that indicates such "weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" that the employer's actions could not be for nondiscriminatory reasons. *Id.* at 765. This pretext analysis is a fact-based inquiry that requires careful attention to the employer's proffered reasons and the plaintiff's claim that those reasons are pretextual. *Kautz v. Met-Pro Corp.,* 412 F.3d 463, 468 (3d Cir. 2005). Alternatively, the plaintiff may establish the second prong of *Fuentes* by presenting evidence that would allow a reasonable jury to conclude that discrimination was the "but-for" cause of the adverse employment decision. *Anderson v. Equitable Res., Inc.*, No. 08-952, 2009 WL 4730230, *14 (W.D. Pa. Dec. 4, 2009) (concluding the plaintiff must show that discrimination was the determinative factor and not merely a factor resulting in the adverse employment decision). This prong may be satisfied by identifying evidence that shows: (1) plaintiff was previously discriminated against; (2) the defendant has discriminated against others within the plaintiff's class; or (3) the defendant has treated more favorably similarly situated individuals. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).

## IV. Discussion

### A. *Prima Facie* Case

The parties agree that Willis is at least forty years old, suffered an adverse employment decision,[3] and was qualified for the position; thus, the only dispute with respect to whether plaintiff adduced sufficient evidence to support a prima facie case of age discrimination involves the fourth element: can an inference of age discrimination be made because sufficiently younger employees replaced Willis?

---

3   The record discloses two possible adverse employments events: demotion for the lead neonatal nurse practitioner role in September 2011 and termination in January 2012. Willis continually refers to her termination in January 2012, rather than her demotion, as the adverse employment event. Willis's demotion from lead neonatal nurse practitioner is not mentioned at all in the amended complaint. Therefore, the court will consider the demotion as evidence of discrimination, but the court will not treat the demotion as the adverse employment decision.

9

Willis was removed from the lead neonatal nurse practitioner position in September 2011, and, as a result, was a regular neonatal nurse practitioner at the time of her termination. (Ex. 3, ECF No. 30.) The day Willis was terminated, DiSilvio, who is thirty-one years younger than Willis, was named interim lead neonatal nurse practitioner. (Willis Dep. at 87:5–9.) Sometime between January and the spring of 2012, DiSilvio was promoted to manager of neonatal nurse practitioners. This position has a different title and entails more administrative work than the lead neonatal nurse practitioner position. In September 2012, approximately one year after Willis was removed from the lead role, Graves, twenty-eight years younger than Willis, became the lead neonatal nurse practitioner. (JCS ¶¶ 44–45.)

Willis argues that the promotion of either DiSilvio or Graves satisfies the fourth element of the prima facie case. (ECF No. 33, at 6.) This is problematic because at the time of Willis's termination she was not a lead neonatal nurse practitioner. Willis cannot satisfy the fourth element of a prima facie case of age discrimination by pointing to individuals that either assumed her responsibilities or filled the lead neonatal nurse practitioner role following her demotion. Willis argues that if she is considered a regular neonatal nurse practitioner, as under these circumstances she must be, she can still establish a prima facie case of discrimination. (*Id.*) Children's hired three neonatal nurse practitioners after Willis's termination: Katlyn Lasek, Ana Gonzalez, and Beth Ann Schaeber. (DiSilvio Dep. 38:9–39:21, Mar. 5, 2014, ECF No. 36-7.) Willis claims "[a]ll three are substantially younger than Plaintiff." (ECF No. 33, at 6.) There is insufficient evidence in the record to support this contention. DiSilvio identifies the new neonatal nurse practitioners and their approximate date of hire, but there is no evidence in the record about their ages or whether they assumed Willis's duties. On this record, no reasonable jury could conclude that sufficiently younger employees replaced Willis or draw an inference of discrimination from that

conclusion. Willis did not adduce sufficient evidence to show that younger individuals replaced her and thus did not support an inference of discrimination.

Willis argues she can satisfy the fourth element by providing evidence that similarly situated, substantially younger employees were treated more favorably than she. (ECF No. 33, at 4.) Willis points to evidence in the record from which a jury might disbelieve the nondiscriminatory reasons put forward by Children's for Willis's termination. These contentions, if proven, would satisfy Willis's burden with respect to the prima facie case notwithstanding the Willis's inability to identify a substantially younger employee who replaced her or took over her job duties. *See Pivirotto*, 191 F.3d at 354.

In *Pivirotto*, a gender-discrimination case brought under Title VII, the Court of Appeals for the Third Circuit found erroneous an instruction that the jury could only return a verdict for the plaintiff if she proved by a preponderance of the evidence that she was replaced by a man. *Id.* at 357. The court of appeals reasoned that the first three elements of the prima facie case "eliminate the most obvious, lawful reasons for the defendant's action (i.e., the position that an applicant sought was not filled for economic reasons, the applicant was not qualified, no adverse action such as failure to hire or firing was actually taken, etc.)." *Id.* at 352. The requirement that a gender-discrimination plaintiff

> prove she was replaced by a man … eliminates no common, lawful reasons for the discharge. If a plaintiff cannot prove that she was qualified for a position or that the employer took an adverse employment action against her, it is clear why her discrimination case should fail. By contrast, a plaintiff's inability to prove that she was replaced by someone outside of her class is not necessarily inconsistent with her demonstrating that the employer treated her "less favorably than others because of [her] race, color, religion, sex, or national origin." [*Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978)] (internal quotation omitted). Even if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer is willing to hire people from

11

> this class—which in the present context is presumably true of all but the most misogynistic employers—and does not establish that the employer did not fire the plaintiff on the basis of her protected status.

*Id.* at 353. While *Pivirotto* addressed the gender-discrimination context, its analysis applies to ADEA cases. *Waldron*, 56 F.3d at 494 n.4. Requiring Willis to prove that she was replaced by a substantially younger employee eliminates no common, lawful reasons for her discharge and is not necessarily inconsistent with Willis's ultimate burden of showing she suffered intentional discrimination because of her age.

The evidence put forward by Willis would not permit an inference of intentional discrimination, and thus she did not satisfy the requirements of the prima facie case. Even if she had adduced sufficient evidence to establish a prima facie case, the ADEA claim would fail under the pretext analysis, which the court will address.

### B. Legitimate Nondiscriminatory Reasons

Assuming, *arguendo*, that Willis established a prima facie case of age discrimination, the burden of production shifts to Children's to provide a legitimate, nondiscriminatory reason for terminating Willis. Children's points to three specific, documented incidents as nondiscriminatory reasons for terminating Willis: (1) on August 19, 2011, Willis used foul language in close proximity to patients, patients' families and co-workers; (2) on January 3, 2012, Willis confronted the clinical leaders regarding the inexperience of the young nursing staff; and (3) on January 11, 2012, Willis left a shift without completing a history and physical on a patient. Due to the nature and documentation of these disciplinary incidents, and their acknowledgement by Willis, this evidence is sufficient for a reasonable jury to find that Children's dismissed Willis for reasons other than her age.

### C. Pretext

Once a defendant meets its burden to set forth a legitimate, nondiscriminatory reason for terminating a plaintiff, the plaintiff must show by a preponderance of the evidence that the legitimate reason offered by defendant is not the true reason, but

rather a pretext for discrimination. *Fuentes*, 32 F.3d at 763. In *Fuentes*, the Court of Appeals for the Third Circuit set forth two ways for a plaintiff to meet this burden. The court will address each in turn.

   *1. First Prong*

Under the first prong of *Fuentes*, a plaintiff may point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992) and *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)). Willis argues the evidence of record rebuts Children's nondiscriminatory reasons for her termination.

With respect to the incident on August 19, 2011, which involved the alleged use of profanity in close proximity to patients and patients' families, Willis disputes Children's version of the events. Willis admitted that she, in a moment of frustration, said "that fucking tube better not be out." (Willis Dep. 35:2–10). This incident transpired in the hallway at 3:00 a.m. (*Id.*) The final written warning Willis received based upon this conduct stated that she "admit[ed] to using inappropriate language including the use of the word 'fuck' while in close proximity to patients and families." (Def.'s Ex. 3, ECF No. 30.) This conduct was in violation of a policy at Children's. (*Id.*) Willis attempts to discredit Children's' reasons by suggesting that her vulgar language was not heard by the patients and that profanity was "fairly commonplace" among employees. (Willis Dep. at 47:17–23.) The patient's father testified that he never heard Willis raise her voice or say "fuck." (Carr Dep. 17:1–13, Mar. 6, 2014, ECF No. 36-3.) Willis argues that Lamouree did not talk to the patient's father and simply assumed the patient's family had overheard the outburst. (ECF No. 33, at 7.)

13

When the court evaluates evidence to determine whether a factfinder could reasonably disbelieve the employer's proffered reasons for dismissal, the court does not "'rul[e] on the strength of "cause" for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'" *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)). For purposes of discrediting Children's' reasons for discipline, whether patients and families actually overheard Willis's remarks and whether Lamouree conducted an extensive investigation are not relevant. The relevant questions are whether Lamouree believed that Willis's remarks had been overheard and whether Lamouree's investigation was so inadequate that it supports an inference of discrimination. Lamouree's uncontroverted testimony is that she "was given statements by nurses who witnessed the conduct for which Ms. Willis was disciplined." (Lamouree Decl. ¶ 6, ECF No. 30.) Willis also sent Lamouree an e-mail in which Willis admitted to using the offensive language and stated she was "very embarrassed and sorry for [her] comments." (Def.'s Ex. 4, ECF No. 30.) Willis admitted that discipline would have been appropriate if she made the statement in the presence of the baby's family. (Willis Dep. 38:24–39:4.) A factfinder could not reasonably find from this record that Children's' reason for giving Willis a final written warning for her statements on August 19, 2011, was so weak, inconsistent, or incoherent as to render it "unworthy of credence." *Fuentes*, 32 F.3d at 765.

With respect to the confrontation with NICU leadership on January 3, 2012, Willis denies that she ever yelled. Willis admitted that she raised her voice, but only enough so that a staff member who was seated some distance away could hear her. (Willis Dep. 42–44.) Again, the question is not whether Willis actually yelled, but whether Lamouree believed she treated staff members inappropriately and imposed discipline for that reason. After the incident, Lamouree spoke with Willis and wrote a

summary of their conversation. Lamouree noted that the clinical leaders were offended and "felt they did not deserve to be yelled at." (Def.'s Ex. 5, ECF No. 30.) Willis acknowledged that this part of Lamouree's written summary was accurate. (Willis Dep. 51–54.) Although there is a factual dispute about whether Willis actually yelled, or just raised her voice, there is no dispute that the clinical leaders told Lamouree that Willis yelled and they felt offended. *See Fuentes*, 32 F.3d at 766–67 ("[T]he issue is not whether the staff members' criticisms of [the plaintiff] were substantiated or valid . . . . [T]he question is whether [the decisionmaker] believed those criticisms to be accurate and actually relied upon them, since only if [the plaintiff] can ultimately prove that [the decisionmaker] in fact did not rely upon them can [the plaintiff] show 'pretext.'").

Willis argues that "[t]he notion that talking loudly could be the basis for discipline is so ludicrous that it cannot possibly be a rational employer's true reason for acting." (ECF No. 33, at 8.) The record evidence indicates that Willis had been warned several times about her interactions with her coworkers. Lamouree stated she had received complaints about Willis's "condescending and harsh style from a number of the nurses as well as from physicians." (Lamouree Decl. ¶ 8, ECF No. 30.) Lamouree wrote in Willis's March 2011 performance evaluation that Willis needed "to improve her communication style, which can be harsh and critical." (*Id.* ¶ 7.) Willis's final written warning, issued September 5, 2011, stated that Willis was "expected to treat both internal and external customers with dignity and respect at all times." (Def.'s Ex. 3, ECF No. 30.) Additionally, the final written warning instructed Willis to "1. Adhere to Children's Hospital of Pittsburgh of UPMC core values. This includes demonstrating dignity and respect at all times. 2. Maintain a positive team oriented attitude and encourage your team members." (*Id.*) Under these circumstances, it was not ludicrous for Willis to be disciplined for what Lamouree perceived to be another instance of harsh or offensive interpersonal communication by Willis.

Willis failed to adduce evidence from which a rational factfinder could conclude that Children's' reasons for discipline with respect to the January 3, 2012, incident were unworthy of credence.

Willis also argues that there is sufficient evidence for the factfinder to infer that the discipline based upon the January 11, 2012, incident was a pretext for discrimination. (ECF No. 33, at 8–9.) The blue team was responsible for the baby's care, so Willis, who was on the green team, was not responsible for completing the paperwork. (Willis Dep. 50:10–21.) Willis admitted that she told Bernardi, a blue team neonatal nurse practitioner, she would take care of the admission orders for this baby, but Willis testified that Bernardi knew Willis was only doing the admission orders and would not complete the history and physical for this baby. (*Id.* at 57:6–11.) Willis testified that close to a shift change the departing shift very frequently would not complete the history and physical. (*Id.* at 57:22–25.) According to Willis, Bernardi was responsible for completing the history and physical. (*Id.* at 58:14–15.) Willis argues that Children's' decision to discipline her for the incident while not imposing discipline on Bernardi shows an inconsistency in Children's' reasoning.

The day after this incident Hupp called Bernardi and Willis at home to determine why the history and physical were not performed. In a written summary of her conversation with Willis, Hupp wrote that Willis told Bernardi "that she had handled the admission" of the baby and "taken care of it." (Def.'s Ex. 6, ECF No. 30.) This summary was corroborated by Bernardi, who testified that Willis told her "she would take care of the new baby." (Bernardi Dep. 39:3–10, Mar. 6, 2014, ECF No. 38.) As they were preparing to leave their shift, Bernardi asked Willis whether the baby needed anything, and Willis said, "No, he's fine." (*Id.* at 39:10–13.) Willis told Hupp "there are times during the end of the shift that they will pass some of the work on to the daylight shift." (*Id.*) When asked whether she had reported the need for a physical and history to the oncoming shift, Willis told Hupp "it was 'very busy' and [Willis]

did not have a clear answer of who she reported off to on not completing the admission work prior to leaving." (*Id.*) Children's' records indicated that not only was the history and physical not performed, but also the admission orders were only partially completed contrary to routine admission practice. (*Id.*)

No evidence in the record contradicts Hupp's written summary of her conversation with Willis. It was Hupp's understanding that (1) Willis told Bernardi she had "taken care of it"; (2) Willis could not answer whether she had told anyone that the history and physical had not been performed; and (3) although Willis told Bernardi she had "handled the admission," admission orders were incomplete. The court's task is not to evaluate whether Willis or Bernardi was responsible for the patient or whether Children's' decision to discipline Willis and not Bernardi was the "correct" decision. Willis's burden is to "show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109. No rational factfinder could conclude that Willis met this burden with respect to the January 11, 2012, incident.

Willis did not show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that would permit a reasonable finder of fact to infer that Children's proffered reasons did not truly motivate its decision to dismiss Willis. *Fuentes*, 32 F.2d at 765.

### 2. Second Prong

Willis may satisfy the second prong of *Fuentes* by producing evidence that evidence that shows: (1) the defendant previously discriminated against Willis; (2) the defendant discriminated against others within Willis's class; or (3) Children's has more favorably treated similarly situated individuals. *Simpson*, 142 F.3d at 645.

(a) Evidence Children's Previously Discriminated Against Willis

The record lacks any evidence of pervious age discrimination against Willis. When Willis was asked whether Lamouree said anything to her that indicated an age

17

bias, she stated, "I cannot recall a specific comment directly to me being a bias towards my age." (Willis Dep. 67:6-7.) Willis could not identify any indication of age bias from conversations with either Valenta or Hupp. (*Id.* at 67:19-68:1.) The only time age appears to have been implicated at all was when Willis mentioned to Lamouree her intent to retire at the age of sixty-five. (*Id.* at 66:19-67:1.) It is not an unusual employment practice to ask an employee how long he or she plans to work. In fact, asking the question might have been prudent or necessary to plan for future staffing needs, especially given the large turnover experienced by the nursing staff at Children's. (*See id.* at 68:13–24.) Asking this question is not evidence of discrimination. Aside from the discipline she received for the incidents described above, Willis did not identify any pervious actions of discrimination against her.

(b) Evidence Defendant Previously Discriminated Against Others Due to Age

Willis adduced no evidence of age discrimination against others. Willis testified that she could not recall any statements by Lamouree, Valenta, or Hupp that showed any bias or discrimination against older employees. (Willis Dep. 67:8–68:1.) Willis testified, however, that the actions of Lamouree, Valenta, and Hupp suggested discrimination against other older employees. (*Id.* at 67:8–12.) The actions Willis identified were replacing experienced NICU nursing staff members with new and inexperienced nurses. (*Id.* at 68:13–24.) Willis estimated that 70 percent of the nursing staff was new and that many experienced nurses left. (*Id.*) The experienced nurses were not fired—they voluntarily quit. (*Id.* at 68:25–69:4.) Willis admitted that Children's expanded its neonatal facility and needed to hire new nurses. (*Id.* at 69:12–20.) An influx of new nurses and the resignations of older nurses is not evidence of discrimination.

(c) Evidence Children's More Fairly Treated Similarly Situated Younger Employees

Willis points to two of the three incidents leading to her termination as evidence that substantially younger employees were more fairly treated. With respect to the final written warning she received for using profanity while in close proximity to patients and families, Willis testified that profanity, including the word "fuck," was "fairly commonplace" among nurses at Children's. (Willis Dep. 47:17–23.) The only evidence that younger nurses were not disciplined for profanity is Willis's testimony that profanity was fairly commonplace. Willis, however, admits "[t]here is … no indication on the record that any substantially younger employee was ever reported for using profanity, much less disciplined for it." (ECF No. 33, at 4.) Willis's general statement that profanity was commonplace is insufficient as a matter of law to show that a similarly situated employee was more fairly treated. To establish that an employee is similarly situated, the plaintiff and the comparator must be similar in "'all relevant respects.'" *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). The relevant factors vary depending on the circumstances of the case, but courts often consider whether "'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)).

Willis testified that the nursing staff "scuttlebutt" was that Graves was reported to management for her abruptness and sarcasm. (Willis Dep. 48:4–49:17.) Willis believed that no disciplinary action was taken against Graves, but she could not identify the nurse or nurses who reported Graves and she did not know what Lamouree discussed with Graves. (*Id.*) Abruptness and sarcasm are not the same as using profanity in front of staff and patients. Graves was deposed for this case, but the

19

excerpt submitted to the court as part of the summary judgment record contains no discussion about any incident involving abrupt language or sarcasm. (Graves Dep., Mar. 5, 2014, ECF No. 36-6.) The record is insufficient to establish that Graves was similarly situated to Willis and was more fairly treated.

Willis did not satisfy the second prong of the *Fuentes* pretext analysis.

## V. Conclusion

Assuming that Willis established a prima facie case, Willis did not adduce sufficient evidence to permit a rational factfinder to conclude that the legitimate reasons for her termination offered by Children's were not the true reasons, but were a pretext for discrimination. Since there are no genuine issues of material fact in dispute, Children's' motion for summary judgment will be granted. Judgment will be entered in favor of Children's and against Willis. An appropriate order will follow.

Dated: February 10, 2015

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge